IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

MID-MISSOURI SPRAY SERVICE, INC.                              PLAINTIFF

v.                          No. 2:13-cv-150-DPM

SOUTH DELTA AVIATION, INC.                                    DEFENDANT

ORDER

The parties have a dispute about a crop duster. South Delta leased the airplane to Mid-Missouri in early March 2010 for three years. Eleven days after the lease, the parties entered into an option agreement: Mid-Missouri had the right to buy the airplane at the end of the lease for $500,000; but it had to exercise that option by giving notice at least thirty days before the lease expired. There is, everyone agrees, a genuine issue of material fact about whether Mid-Missouri gave timely notice that it wanted to buy the airplane. South Delta seeks summary judgment nonetheless, arguing that, assuming Mid-Missouri gave the notice, Mid-Missouri sustained no recoverable damages because it didn't have the money to do the deal.

South Delta is right about the governing law. RESTATEMENT (SECOND) OF CONTRACTS § 254(1) AND COMMENT A; *Acme Investment, Inc. v. Southwest Tracor, Inc.*, 105 F.3d 412, 415 (8th Cir. 1997). Even if South Delta repudiated

the option by refusing to consummate the sale, Mid-Missouri cannot recover unless it was ready, willing, and able financially to perform its obligation of paying the $500,000 in cash for the airplane at closing. *Ibid.* The Arkansas Supreme Court hasn't addressed this issue; but this Court predicts it would adopt the RESTATEMENT'S understanding of the common law. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010).

Mid-Missouri is an L.L.C.; Daniel and Neva Edwards are the members; Daniel is the managing member. He testified that Mid-Missouri had to have a loan to buy this airplane, and sought financing from Farm Credit Services to do so. The record contains loan documents, many of them unsigned, including a December 2012 letter from a Farm Credit officer to the Edwardses and Mid-Missouri. The letter said they'd been approved for a $500,000 loan—conditioned on an appraisal and "a conditional commitment for guarantee through the USDA Rural Development Business and Industrial Guaranteed Loan program." № 27-3 at 46. There's also a January 2013 email from Farm Credit sending an approval letter, a copy of a loan application, and a "Guarantee Application" to the Edwardses. № 27-3 at 42. This loan application is by Eagle Aircraft L.L.C. — another Edwards entity, which their

-2-

accountant had set up in Montana for tax reasons. № 27-3 at 41.

On deposition, Mr. Edwards was hazy about all these transactions. He was clear, though, about several things:

- He never completed the financing through Farm Credit; Edwards said this was because South Delta wanted the airplane back. № 27-3 at 20, 26-27.

- He didn't have loan approval or available funds to buy the airplane in early March 2013, when the lease expired. № 27-3 at 26-27.

- He didn't have the ability to pay the $500,000 at the end of the lease in early March 2013 without the Farm Credit loan, which hadn't gone through. № 27-3 at 28.

Mid-Missouri seeks a trial on its ability to close the sale. It points out that, under the option, Mid-Missouri didn't need the $500,000 cash in hand until closing. № 27-2 at 1, ¶ 2&4. No closing date was ever set. This fact distinguishes this case, Mid-Missouri says, from *Acme*, where there was a clear three-month closing window. 105 F.3d at 417. Mid-Missouri also relies on a 12 March 2013 letter from its lawyer to South Delta, which said that Mid-Missouri and Mr. Edwards stood ready to pay the money. № 31-3. Finally, there are some late-March transaction documents about a different crop duster. Mid-Missouri agreed on 27 March 2013 to buy another airplane for

-3-

$710,000. Another lender—First Pryority Bank—financed the deal for Eagle Aircraft, L.L.C. (the Edwardses' new Montana L.L.C.) and the Edwardses on 30 March 2015. And Eagle Aircraft bought this other airplane, closing (apparently) on 8 April 2013. *№ 31-5 at 1–5.* Mid-Missouri argues that this nearly contemporaneous transaction shows its ability to perform, or at least creates a jury question.

Of course Mid-Missouri's lawyer can't be a witness too, so the letter from counsel is out. MODEL RULES OF PROFESSIONAL CONDUCT 3.7(a). It's unclear whether the other-airplane transaction documents were timely produced in discovery. South Delta says they weren't. *№ 33 at 1.* The loan commitment obtained by a related entity in *Acme* came many months after the closing period; so these circumstances present a closer timing question. 105 F.3d at 417. But South Delta is correct that the law stands in Mid-Missouri's way here. A principal's ability to perform, or a related entity's ability, does not show Mid-Missouri's ability unless the third party had some obligation to fund the deal. *Acme*, 105 F.3d at 417. There is no record evidence that either the Edwardses or Eagle Aircraft had any obligation to finance consummation of Mid-Missouri's option from South Delta. So the other-transaction

-4-

documents fall out of the scales too.

South Delta's strong argument from the RESTATEMENT and *Acme* is weakened somewhat by the option's terms. № 27-2. The key paragraph is in the margin.* This agreement set no closing date or closing period. And it set no period for Mid-Missouri to evaluate title. Instead, it implicitly required South Delta to offer title, with closing to be no more than ten days after Mid-Missouri found the title offered to be acceptable. If Mid-Missouri made a material objection to title in writing, the agreement gave South Delta sixty days to cure. Mid-Missouri could walk if, after the cure period, it concluded the title wasn't merchantable. And it had to pay the costs of determining

---

*Title documents: lf material objections to title to the property are presented in writing to the GRANTOR and the same shall not have been due to actions of the GRANTEE the GRANTOR shall have a reasonable time, not to exceed 60 days, within which to cure the same. In the event that the GRANTEE does not assert any material defects in the title offered, or if the title is found to be acceptable to the parties, a closing date shall be set for a time mutually agreeable to the parties, but not tater than ten (10) days following the date title is found to be acceptable. In the event title is not found to be merchantable and the defects therein are not cured by the GRANTOR as set out herein, the GRANTEE shall have the right and option to cancel and terminate the then existing contract for the purchase of the property and to be refunded the amount paid for the option, and at that time, all of the mutual rights of the parties hereunder shall cease and terminate. Any cost to determine the merchantability of title shall be at the sole expense of GRANTEE. № 27-2.

merchantability.

The parties never got there. After Mr. Edwards exercised the option in a mid-January telephone call, it is undisputed that he had no further communication with South Delta until after the lease had expired in early March. № 27-3 at 20. Mr. Edwards did not let South Delta know anything about how the loan was moving along. *Ibid.* South Delta didn't offer title; Mid-Missouri never evaluated title; and closing was never set. South Delta emphasizes that no one ever raised a title question. In the lease, South Delta covenanted that it had clear title except for "One Bank" and could enter into the lease. № 27-1 at 2. All this creates some murkiness about the closing date, and thus about when exactly Mid-Missouri had to come up with the money.

Both parties' arguments assume, though, that closing had to occur around the time that the lease ended: 3 March 2013. The Court agrees. Absent an agreed time for performance, the law implies a term that performance must occur within a reasonable period. *Taylor v. George*, 92 Ark. App. 264, 272, 212 S.W.3d 17, 23 (2005). The option had to be exercised at least thirty days before the lease expired. № 27-2 at ¶ 1. (The option referred to a lease of "even date herewith," but the parties' undisputed execution of

the lease on 3 March 2010 can't be undone by a stray phrase in a form agreement.) The parties' agreements must be construed together. *Integon Life Insurance Co. v. Vandegrift*, 11 Ark. App. 270, 276, 669 S.W.2d 492, 495 (1984). The only reasonable construction of those two agreements is that closing would occur no later than the date the lease expired. That's when the airplane had to be returned to South Delta unless there was a purchase. *№ 27-1 at 2*. Absent some title problem, which could have triggered a cure period beyond the lease term depending on when the option was exercised, no other date makes sense of the parties' deal as a whole. *Ibid.* Early March is therefore the key undisputed point in time.

There is simply insufficient evidence of record from which a reasonable person could conclude that Mid-Missouri could have come up with the money in early March. Mr. Edwards's testimony on this point was clear, unequivocal, and undisputed. No loan proceeds; no purchase. And Mid-Missouri had no loan proceeds available in early March. *№ 27-3 at 20, 26-28*. South Delta, therefore, is correct. Because there's insufficient evidence to create a jury question on whether Mid-Missouri could have closed the deal in early March 2013, Mid-Missouri cannot recover for South Delta's (assumed)

repudiation of the option to buy the airplane.  RESTATEMENT (SECOND) OF CONTRACTS § 254(1) AND COMMENT A; *Acme*, 105 F.3d at 415.

* * *

South Delta's motion for summary judgment, № 26, is granted.  It's motion *in limine*, № 12, is denied as moot.

So Ordered.

*W.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

19 June 2015